## THE LONE STAR.[1]

### (District Court, E. D. New York. April 7, 1888.)

1. SALVAGE—SALVAGE SERVICES—VESSEL AT DOCK—FIRE.

The steam-ship Lone Star lay on the lower side of pier 37, North river, New York, when fire broke out on the wharf, which spread with great rapidity, until the steam-ship herself caught fire. Various tugs came to her assistance, and when the hawsers which fastened her to the pier were burned away, some of them drew her out into the stream, where other tugs came along-side, and she was towed, water being pumped on her mean time, to the flats at Weehawken, where she sank, and the fire was extinguished. *Held*, that the tugs were entitled to salvage.

2. SAME—COMPENSATION—DIFFERENT GRADES OF SERVICE—TOWAGE AND PUMPING.

The services rendered by the tugs to the steam-ship differed in degree. *Held*, that the most important service was rendered by the tug Pioneer, which put the line on the Lone Star by which she was towed out from the burning pier into the river. To her was awarded $1,800 as salvage. *Held, further*, that other grades of salvage services were rendered by the tugs which assisted in towing the steam-ship to the flats, and by the tugs which pumped water on the fire. To these tugs various sums, from $1,000 to $250, were awarded.

3. SAME—IRON VESSEL—VALUE OF SALVORS' SERVICES—BASIS, OF COMPUTATION.

The Lone Star was an iron steam-ship. She was so much damaged by this fire that she was sold as a wreck. If she had received no assistance she would have been sunk in her slip, and would have been raised and sold as old iron. *Held*, that in ascertaining the value to the ship-owner of the services rendered by the salvors, the amount that the owners would have realized from her sale as old iron, if she had so sunk, should be deducted from the proceeds of her sale as a wreck. For the purposes of this computation of salvage, such amount saved to her owners was found to be from $22,000 to $29,000. The total award to the tugs was $8,350.

In Admiralty. Libels for salvage.

Eleven different suits were brought against the wreck of the steam-ship Lone Star for salvage services rendered to her in the fire at Morgan's Line pier, in February, 1887. The suits were consolidated on motion.

*Alexander & Ash*, for Howard.

*Wing, Shoudy & Putnam*, for Kinny, Love, and Chapman.

*Wilcox, Adams & Macklin*, for Bridges.

*Butler, Stillman & Hubbard*, for McCaldin.

*Anson B. Stewart*, for Hofman.

*Edward D. McCarthy*, for Hicks and Sullivan.

*Charles H. Tweed* and *R. D. Benedict*, for the Lone Star.

BENEDICT, J. This is a consolidated action to recover salvage compensation for services rendered by 12 different steam-tugs to the steamer Lone Star, on the occasion of the fire at the pier of the Morgan Line, in the North river, which occurred on the 28th day of February, 1887. The fire broke out upon a lighter loaded with cotton lying at the outer end of pier 37. The pier was a covered pier, and its shed was full of cotton and other goods. The tide was ebb, and a gale was blowing from the north-west.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

The steamer Lone Star was fast by hawsers to the lower side of the pier, her bow being about 200 feet inside the outer end of the pier. She had no cargo on board. Shortly after the fire broke out the steamer became enveloped in flames, and all on board left. In time the fire burned off the hawsers by which she was fast to the dock, and, under the influence of the strong wind and ebb-tide she would then have drifted across the slip, and beyond the reach of assistance, had she not been at once towed out of the slip. This was done by tugs, requested to perform the service by the superintendent of the pier, then present. One of the tugs which towed the steamer out was the Pioneer. This tug, in anticipation of the burning of the fastenings of the steamer, placed herself along-side, and sent a deckhand named Bridges on board the steamer, at considerable personal risk, who made fast on the steamer's bow a line hauled by him from the Pioneer. At this time the fire was furious on board the steamer, so that the master of the Pioneer required an assurance from the superintendent of the pier that means of escape would be furnished to Bridges when the Pioneer should move away from the steamer in order to tow her. As soon as the fastenings of the steamer burned off, the Pioneer, being fast to her by a line from her bow, began to move her out of the slip. In rendering this service she was aided by the steam-tug Missisquoi, which tug, at the request of the Pioneer, made fast along-side of her after the steamer began to move, and with her towed the steamer out of the slip. At the same time, abaft of the Pioneer, under the steamer's port quarter, was the tug Harry Roussel. This tug, at some time before the steamer began to move, had made a line fast to the steamer, and began to throw water into her through one of the dead-lights. She had also a line to the lighter Angeline Anderson, which lighter was loaded with cotton, and on fire. The tugs Missisquoi and Pioneer were sufficiently powerful to tow the steamer out of the slip, and to a place where she could be beached, but shortly after they reached the mouth of the slip the towing line of the Pioneer was cut by the master of the steam-tug America, (who, by the way, makes no claim to salvage in this action,) and thereby the steamer was at once placed in peril of going upon the Guion dock, pier 38. In fact, before another line could be got to her, she did touch that dock, without, however, doing or receiving damage. As soon as possible after the Pioneer's line parted, another line was got on the steamer from the steam-tug Runyon. This tug, aided by the tugs Reba, Missisquoi, Myers, and Coffin, towed her to Weehawken, where she was beached. During this time the steamer was burning furiously, —"her forecastle all roaring with fire," as the superintendent says,—and she was deluged by water thrown from various tugs which came alongside as soon as she was clear of the slip, and continued to pour water upon her, until the fire was extinguished at Weehawken. The damage done to the steamer was so great that it was thought undesirable to attempt to repair her, and she was accordingly sold in her damaged condition at auction, and brought the sum of $37,500.

That an important salvage service was rendered on this occasion has not been denied; but a controversy has arisen in regard to the extent and

value of the services rendered by the respective tugs, and the amount of property saved to the ship-owners by the exertions of the salvors. In determining these questions it will be convenient to consider in the first place the amount of money saved to the ship-owner by the exertions of the salvors. It is conceded that the steamer was so injured by the fire as to render it proper to sell her as a wreck, and that the proceeds of her sale were $37,500. This sum, the salvors claim, should be taken to be the value of the property saved, in computing the amount of the salvage award. But in a case like this, where the only danger was of fire, and where the vessel, being of iron, would not be wholly destroyed by fire, and where the vessel, if she had received no assistance, would certainly have been sunk in the slip, and as certainly have been raised therefrom as old iron, it seems to me proper in ascertaining the value to the ship-owner of the services rendered by the salvors, for the purpose of determining the amount of salvage to be awarded, to deduct from the proceeds of the sale of the steamer as a wreck the amount that her owners would have realized from her sale as old iron if she had burned and sunk in the slip. It is not necessary for the purpose of the computation in hand to determine with accuracy the amount thus saved to the owners of this steamer. It is safe to consider that amount to be somewhere from $22,000 to $29,000. The case, therefore, is not one where amount of the salvage award is enhanced by the large value of the property saved.

The risk to which this property was exposed is next to be considered. The steamer was all on fire. Several tugs applied to by the superintendent to go into the slip refused to do so. If aid had been refused by the tugs that did go into the slip, it is highly probable, although not perhaps actually certain, that all that was combustible in the steamer would have burned, and the hulk sunk in the slip. It is hardly a case of derelict property saved to the ship-owner, but the ship-owner was in such great danger of losing from $22,000 to $29,000 that that sum may be considered as representing the value to the owner of the steamer of the services in question.

Next will be considered the extent and value of the services rendered by these various tugs, and I remark first that I consider the case one of continuous salvage service from the time the steamer began to move out of the slip until the fire was extinguished at Weehawken, participated in by different tugs at different times and under different circumstances. These services may well be divided into three classes: *First*. Services rendered in moving the vessel from the burning pier out of the slip. These I consider the most important services rendered on this occasion, and they were attended with some danger to the tugs engaged. *Second*. Services rendered in towing the steamer after she had been towed out of the slip, and the Pioneer's line was cut, until she was beached at Weehawken. These services were attended with little or no danger to the tugs, and many other tugs were present ready and willing to tow the steamer, the services differing little in character from ordinary towage. *Third*. Services which consisted in pumping water to extinguish the fire. This was a necessary service to prevent the steamer from sinking.

It involved some danger to the vessels engaged in its performance, and some hard labor and exposure in freezing weather. In regard to the services rendered in towing the steamer out of the slip from the burning pier, a serious dispute has arisen respecting the part taken by the Harry Roussel. Those on the Pioneer say that the Harry Roussel went in the slip for the purpose of saving the Angeline Anderson and her cargo of cotton, then on fire, and, while so engaged, got herself into a position across the slip, from which, in that wind and tide, she could not escape without assistance, so that she would have been herself caught and destroyed by the burning steamer when her fasts burned off, if the steamer had not been removed by the Pioneer; that the Pioneer pulled the Roussel into position by a line, and enabled her to swing along-side of the steamer, so that she, with the lighter Angeline Anderson attached to her, was in fact towed out of the slip by the Pioneer, instead of assisting the Pioneer to tow the steamer out. On the other hand, it is contended in behalf of the Roussel that her line was on board of the steamer before the line of any other tug, and that not only did she pour water into the steamer before she began to move, but also rendered efficient service by her motive power in keeping the steamer up to the tide as she moved out of the slip.

The case contains considerable testimony corroborative of the story told by the Pioneer in respect to the services of the Roussel, and much to the contrary. Considering the circumstances, confusion in the testimony is not to be wondered at. Upon the whole, I incline to believe that the Roussel went into the slip for the purpose of taking out the burning lighter; that afterwards she did get a line to the steamer, and did throw water into the steamer before she began to move from the slip, and then, when the steamer did move, she was to some extent aided by the motive power of the Roussel. But I do not consider the services of the Roussel equal in value to those rendered by the Pioneer. Her position made it impossible for her to render important towing service. The services of the Pioneer, in my opinion, were of the most value to the steamer on this occasion. She was efficient to carry out the wishes of the superintendent of the pier, and it was at his request that she put herself alongside the burning steamer. Her line run to the steamer's bows furnished the steamer the means of escape, and when, through no fault of hers, the line parted, she dropped back, and took a position where she could aid by pumping, and did pump under the direction of the superintendent of the pier or master of the steamer until the fire was extinguished at Weehawken. She received damage to her paint amounting to about $125, and she lost a new hawser. To her is awarded the sum of $1,800. The Roussel was a vessel twice as large as the Pioneer, but from her position at the stern of the steamer she was unable to afford much necessary aid in the towing service. Still, she was in the slip,—a position attended with some danger,—and she threw water from the first into the steamer. She was occupied about seven hours. To her the sum of $900 is awarded. The steam-tug Missisquoi was a more powerful boat than the Pioneer. She rendered necessary assistance to the Pioneer in getting the steamer

out of the slip, and she did not obtrude her services, but waited the request of the Pioneer before she took hold. After the Pioneer's line had parted she assisted the Runyon in towing the steamer over to Weehawken. To her is awarded the sum of $1,000. The steam-tug Charles Runyon was a powerful boat, valued at some $20,000. She rendered efficient service in getting the steamer away from the Guion pier, on which she drifted after the Pioneer's line had parted, and she towed her to Weehawken by her hawser. When the fire broke out, she gave up a job worth $40 to go to the steamer, and she lost a line worth $30. What she did was done under direction of the superintendent of the pier, or the master of the steamer. To her is awarded the sum of $650. The Reba, valued at $6,000, assisted in towing the steamer over to Weehawken. She acted under the direction of the superintendent of the pier, or the master of the steamer. To her is awarded the sum of $250. The Egbert Myers and the Coffin also assisted in towing the steamer to Weehawken, under the direction of the superintendent of the pier. The service involved no risk to speak of. To each of these tugs is awarded the sum of $250. The William J. McCaldin was a steam-tug of considerable power. She claims to have rendered assistance in towing the steamer out of the slip, but I am unable to discover any services of much value rendered by her, except pumping water into the steamer. That, as I have said, was an important service. She was the largest tug present. She abandoned a tow to go to the assistance of the steamer, and a length of her hose was destroyed by fire, and she was put to expense in all about $300. To her the sum of $800 is awarded. The steam-tugs Nellie, John Fuller, Alice Hegarty, James A. Garfield, George H. Dentz all rendered service in pumping water into the steamer after she had been taken out of the slip. None of them went into the slip. Their aid in towing was not important, and there is some evidence tending to show that in their anxiety to put water on the fire they embarrassed to some extent the operation of towing the steamer after she reached the mouth of the slip. To the Nellie is awarded the sum of $800; to the Fuller is awarded the sum of $400; to the Hegarty is awarded the sum of $400; to the James A. Garfield is awarded the sum of $400; to the George H. Dentz is awarded the sum of $400. To the man Bridges, who went on board the burning steamer to make fast the Pioneer's line, the sum of $50 is awarded, in addition to his share as one of the crew of the Pioneer.